## Scott, et al. v. Kirkpatrick.

(Decided November 25, 1924.)

### Appeal from Graves Circuit Court.

1. Parent and Child—Parent's Contract Relinquishing Custody of Child Will be Disregarded if for Child's Welfare.—Contract whereby mother relinquishes custody and control of child will be disregarded, where welfare of child dictates that it should be done.

2. Parent and Child—Mother Awarded Custody of Daughter in Preference to Grandmother and Great-grandmother.—Mother's custody of six year old daughter in preference to paternal grandmother and great-grandmother held to be for child's best interests, particularly in view of Ky. Stats., section 2016, giving parent preference.

HOLIFIELD, GARDNER & McDONALD for appellants.

F. B. MARTIN, O. H. BROOKS, SETH T. BOAZ and BROOKS & BURNETT for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE—
Affirming.

The parties to this litigation bring to us for review and final decision the question: Who, as between them, is entitled to the custody of Helen Burnell, an infant now about six years of age? The appellants, Mrs. Sallie Scott and Mrs. Fannie Burnell, are respectively the paternal great-grandmother and grandmother of the child, while the appellee, Ima Kirkpatrick, is her mother. Considering it unnecessary to state the devious route pursued before the litigation eventually was tried on the issue above suggested in the Graves circuit court, it is sufficient to say that when there tried that court had jurisdiction to try and determine the question. (See Strangeway v. Allen, Judge, 194 Ky. 681.) By judgment the chancellor awarded the custody of the child to its mother, the appellee, and appellants prosecute this appeal from that judgment.

The facts out of which this controversy arose briefly stated are these: Appellee, whose maiden name was Ima Drew, married Cecil Burnell in February, 1917. Out of the union there was born to them two children, the oldest being Helen Burnell, the child now in controversy. When the youngest child was about five months of age Cecil Burnell abandoned his wife and children, departed from the community in which he lived and has since resided elsewhere, his place of residence not appearing in the record. He was the son of the appellant, Fannie Burnell. When he abandoned his wife and children he left them without property of any kind and utterly destitute. Under those circumstances it became necessary for appellee to support herself and children. She moved with them to Paducah, Ky., where she engaged in some character of factory work at wages of $12.00 per week. As may readily be understood she soon found that she could not support herself and two helpless infant children on the wages she was able to make, and she found it necessary to make some disposition of her children. The little daughter was turned over to her paternal grandmother, appellant Fannie Burnell, and the parties differ as to what the arrangement was between them. Appellants claim that in consideration of their agreeing to care for and support the child appellee relinquished to them all claims to her.

Appellee contends that she surrendered the custody of the child to the grandmother temporarily and with the understanding that she would care for the child until the circumstances of the mother might be so improved that she herself could care for it. After the child was left with her grandmother appellee again returned to Paducah and engaged in such work as she could find to do in an effort to support herself. Later she was stricken with appendicitis and while ill from that malady met Dr. R. B. Kirkpatrick, a physician and surgeon of that city. He seems to have become interested in her, and, both prior and subsequent to the surgical operation to remove her diseased appendix, the doctor had appellee cared for in the home of his parents, who resided in one of the suburbs of Paducah. After her recovery from the operation appellee began to work for this physician as office girl and assistant. It appears from the record that Dr. Kirkpatrick had been married and that he and his wife had separated. Appellee instituted an action for divorce against her first husband, Cecil Burnell, in which she was adjudged an absolute divorce and the custody of her children. In a divorce proceeding between Dr. Kirkpatrick and his wife growing out of a separation which occurred before he met appellee a judgment was entered divorcing them and settling their respective property rights by the doctor paying to her alimony in a lump sum to the amount of $2,500.00. In that proceeding Dr. Kirkpatrick's former wife was adjudged the custody of their children. Within a very short time after the last of the two divorce judgments was rendered Dr. Kirkpatrick and appellee were united in marriage. Thereafter appellee, in the belief that the time had come when she, with the assistance of her then husband, was able to and could properly take care of her daughter, Helen Burnell, sought to have her restored to her by the appellants. She had then been in the custody of appellants about eighteen months. They declined to give her up and this litigation ensued.

Appellants contend that they are entitled to the custody of the child under the contract and because they are suitable persons to rear her and because appellee is not a suitable person to intrust with her custody and training.

From the proof it appears that the grandmother and great-grandmother of the child claiming the right to her

custody live together on a farm in Graves county, Kentucky, the farm being valued at something like $6,000.00. The grandmother is fifty years of age while the great-grandmother is seventy-seven. They live alone and the farm is located in a rural section of the county. However, it appears that they live reasonably close to one of the public schools of the county and within a mile of a church at which religious worship is engaged in once a month. They appear to be ladies of splendid character, the grandmother formerly having been a school teacher. The proof for the mother is to the effect that she is now the wife of a reputable physician, in good standing in the city of Paducah; that she lives in one of the best residential sections in that city; that the doctor is making approximately $500.00 per month from the practice of his profession; that he has every prospect of anticipating that his practice and remuneration from it will increase as time goes on; that they are persons of suitable character to rear and train the child; that the doctor by his own testimony shows his willingness and desire to have his wife's child brought into his home; and that therefore they have established that, looking alone to the best interest of the child, she will have better opportunities to be properly reared and trained for useful citizenship in the home of her mother than in the home of her grandmother.

To establish their contention that appellee is not a suitable person to rear and train the child in question, appellants proved by the depositions of some three or four persons that she and her husband, Dr. Kirkpatrick, are persons of general bad moral character. A careful analysis of all that testimony, however, discloses that the sole fact upon which such conclusion of the witnesses was based was the fact that appellee, while working at $12.00 per week in Paducah for a very limited period of time, roomed in what was clearly established by the proof to be a house of ill-fame; and the fact that while she lived there Dr. Kirkpatrick went there to see her. The testimony established that the house in question was located in what was considered a respectable part of Paducah. With reference to the short period of time she roomed in that house, appellee testified that owing to the extremely meagre wages then being received by her for her work she could rent only the cheapest of rooms; that, attracted by the cheap rate at which the room was advertised in one of the Paducah papers,

she rented it with no knowledge that its keeper and inmates were people of ill repute; that while she roomed there she was engaged throughout all of each day in laborious work; that she left early each morning to procure her breakfast before work and when the day was over procured the evening meal before returning to her room; and that consequently only her sleeping hours were spent in her room. She testified that as soon as it was suggested to her that the house in which she was rooming was not a proper place for her to live—that suggestion perhaps being made by the doctor himself—she immediately moved; and that altogether she lived there not exceeding a week or ten days. No witness testified as to any act of lewdness or misconduct on the part of appellee while living at the house in question or as to her participating in any way in the immoral conduct of the house.

It will be observed that in considering this case we are confronted with the conflict in testimony of the parties as to whether or not appellee, the mother of the child, surrendered her right to its custody and control to appellant, the grandmother. It is a well established principle in this court that where it is conceded that such a contract had been made it will be disregarded where the welfare of the infant dictates that such be done. That question was considered and exhaustively treated of by this court in Bedford v. Hamilton, 153 Ky. 429. The rule was well and succinctly stated in Green v. Campbell, 35 W. Va. 698 (29 Am. State Rep. 843): "The welfare of the infant is the polar star by which the court is to be guided in the exercise of its discretion." The principle was well written in the Bedford case, *supra,* by this court in these words: "The welfare of the child is the paramount question and the chancellor will close his eyes to all other considerations and look alone to the one great, vital thing, viz.: 'What will bring the best results in the end to the infant?' " Those principles were enunciated in cases in which it was established by uncontroverted testimony that a contract had been made by which the custody of the child had been surrendered by the parent to another. In the absence of such a contract, section 2016, Kentucky Statutes, provides that the father and mother shall have the joint custody, nurture and education of their infant child or children, and in the event of the death of either the survivor, if suited to the trust,

shall have the custody, nurture and education of such infant child or children.

We feel, then, that whether there was or was not a contract between the parties by which appellee gave her child to appellants, we can not go wrong in this matter if we look solely to the interest of the child and award her to the one who, in our judgment, in the light of the facts in this record, will best care for, rear and train her for life. We have on the one side, then, Helen Burnell's grandmother and great-grandmother shown to be ladies of such character, education and refinement as would insure the child proper home surroundings. However, the great-grandmother is seventy-seven years of age and the grandmother is fifty. The material things of life would of necessity have to be furnished her out of the income from a $6,000.00 farm which was shown not to exceed $300.00 per year. Their home is in a rural community and the child's opportunity for an education necessarily would have to depend upon the character of schools provided for rural settlements by our common school system. At the church in the neighborhood religious services are held only once a month. We have to take into account, also, the fact well known from experience in the world that grandparents, by some strange bent of their love for their grandchildren, seem never to be able to subject them to what for lack of a better word we will call "discipline."

On the other hand, we have the mother of the child contending for the right to its custody. The record discloses that she is now the wife of a reputable, licensed, practicing physician, in good standing; that they have a suitable home in one of the best residential sections of Paducah; that the doctor is possessed of an estate worth, perhaps, $10,000.00, and has a practice that pays him on an average of $500.00 per month, with every prospect that it will increase as time goes by. From the home of appellee in Paducah the child would have a much better opportuntiy to receive a thorough education, because of the better school facilities of that place and because appellees are much more able financially to provide it for her. Sunday school and church services would be much more accessible. We are not impressed with the testimony offered by appellants as tending to show that appellee and her husband are not morally suitable to intrust with the custody of a child. It is not to be believed that, if appellee was the common inmate of a house of ill

repute and the doctor had visited her at that house for immoral purposes, he would have subsequently taken her into the home of his parents to be cared for by his mother; nor is it consonant with reason that if the relations between appellee and the man, who afterwards married her, while she lived in the house in question were what appellants would have us believe, that the doctor subsequently would have taken her as his wife. Appellants seek to make much of the fact that the mother did not visit her child and did not at Christmas time send presents to it, as tending to show that she has no love for her daughter. We do not understand how, having to feed, clothe and provide for herself a place in which to sleep from the meagre wage of $12.00 per week, she could have had any money with which to defray the expense of visits to her daughter or presents for her, however much out of love for her child she may have desired to do so. But for the "Good Samaritan" who met her on the way in the person of the man who is now her husband and the charity of himself and his parents to her when illness brought her down she, perhaps, today would be sleeping in a pauper's grave. As soon as her circumstances were such that she could she sought to possess herelf of her child that she might do for her those things which cruel poverty previously had kept her from doing. We are impressed that by having survived the experiences of her life disclosed by the record to attain the station now hers appellee has demonstrated that she has character above the average. Only a woman of character could have survived.

Owing to the preference given parents by the statute referred to, in view of the uncertainty of the record as to whether or not the contract was made as appellants contend, and, as is the rule with us, looking solely to the best interests of the infant at stake, we conclude that the mother in this case is the proper custodian of her child.

The judgment is affirmed.