### Johnson v. Cook.

(Decided Oct. 14, 1938.)

842

BOND & BOND for appellant.
HOWARD & MAYO for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

This appeal submits for our determination a most delicate question, and one, that had our duty not imperatively demanded, we would have been glad to have escaped. It is this: To which one of the party litigants should the custody and control of Ralph Cook, Jr., an infant five years of age, be adjudged under the facts disclosed by the record? They are these: Seland Cook and the appellee and defendant below, Liza Cook, were and are the parents of Ralph Cook, Sr.—the latter with a brother, Sherman Cook, and the parents of both composed the members of the household, who resided on a

farm on Jack's Creek in a section of Floyd county remote from Prestonsburg, Kentucky, its county seat. Near the first of the year 1932 the son, Ralph Cook, Sr., married the appellant and plaintiff below, Margaret Cook Johnson—she at that time being 17 years of age. They took up their abode in the home of Ralph's parents and on September 16, 1932, the infant child, Ralph Cook, Jr.—the subject matter of the controversy in this litigation—was born. On August 10, 1933, Ralph Cook, Sr., was killed in a fight in which his brother, Sherman, and his father, Seland Cook, were engaged. The latter was wounded in that difficulty and Sherman Cook killed another, for which he was indicted and tried and punished by confinement in the penitentiary for life. Seland Cook (the father of Ralph, Sr., and Sherman Cook) was murdered in November, 1935.

One month and 6 days after the death of Ralph Cook, Sr., his widow, the appellant, left the residence of her child's grandparents and took up her abode (temporarily or otherwise) with her mother who lived but a short distance away in the same neighborhood, and which she was induced to do, according to the preponderance of the testimony, because of two facts—one that her mother had become an invalid and needed her services in the household, and the other that Seland Cook was cruel to her, and combatted her efforts to bestow parental affection upon her infant child, to whom Seland Cook, her father-in-law, as well as appellee, appear to have become attached. She left her then weaned child with its grandparents. Appellant, though separated residentially from her child, visited it on more or less frequent occasions, but she testified—and we think her testimony is sustained by the record—that the grandparents received her visits coolly, and exhibited jealousy towards her through fear that she would eventually seek the custody and control of her infant child, thus depriving the grandparents thereof.

Slightly more than a year after appellant went to the home of her mother she married Jonathan Johnson, and as a result of that marriage two children were born—one now four years old and the other, perhaps, two years of age—Ralph Cook, Jr., of course, being their half brother. Before the death of Seland Cook he executed deeds to his surviving children, conveying each of them portions of his land, one of which conveyed

to Ralph Cook, Jr., the portion to which his father would have been entitled as a potential heir of the vendor had he then been living. The appellee and defendant below (grandmother) after the tragic death of her husband, moved to McDowell, a small mining town in the same county but about sixteen miles distant from her former home. In the meantime she was appointed guardian of her grandchild and executed bond and qualified as such. For more than two years she made no settlement with the county court, and proceedings were instituted by the infant ward, through his mother (appellant) as his next friend, and a settlement was forced wherein appellee claimed credit by her attorney's fee in resisting the enforced settlement, and also charged her ward with $10 per month for his up-keep and, perhaps, sought other credits that the mother and the next friend of the infant thought were illegal. That litigation resulted in the removal of appellee as the infant's guardian and another was appointed in her stead.

On April 8, 1938, this action—in the nature of a declaratory judgment proceeding—was filed in the Floyd circuit court by appellant as plaintiff against the appellee as defendant (and by which terms they will each be referred to hereafter) in which plaintiff sought to recover the possession of her infant child from defendant and to be adjudged entitled to its control and custody. The defenses contained in the answer and rejoinder of defendant contested the suitability and fitness of plaintiff to have the custody and control of her child, and averred that she (defendant) possessed those necessary requisites and that it was essential to the future welfare of the child that she continue as its custodian, with the incident right of its control. Plaintiff's responsive pleadings—as well as affirmative averments in her petition—put in issue such defense and upon trial, after hearing considerable evidence, the court, sitting as a chancellor, dismissed plaintiff's petition and decreed the custody and control of the infant to defendant, from which judgment plaintiff prosecutes this appeal.

The proof shows that defendant has some property, the exact value of which is not disclosed. It consists principally of real estate, but we have been unable to find anywhere in the record the total aggregate amount thereof. It is reasonably apparent, however, that it ag-

gregates only a moderate amount. Neither plaintiff, nor her husband, owns any property, except some household and kitchen furniture with some domestic fowls and animals; but they are each young, energetic and physically vigorous and possess at least average intelligence. They each exhibit not only a strong desire, but an unqualified willingness that the child, Ralph Cook, Jr., be placed in their custody and control—not only for the consoling comfort that it would furnish, both to the mother and to her offspring (her first born), but that in addition thereto the child might have the benefit of being reared in intimate association with his half brother and sister; whereas in the home of defendant he has no child associates whatever. Perhaps it is true that the school facilities in the vicinity of McDowell, where defendant resides, are superior to such facilities in Jack's Creek, where plaintiff and her husband reside; but it is clear from the testimony that a convenient public school is located near their residence where grades as high as the eighth are taught, and there is nothing to show but that the school near plaintiff's residence is as efficient in the grades therein taught as is the consolidated school in or near the town of McDowell. So that, at least for some years hence the opportunity for the infant's schooling is to all intents and purposes as convenient and efficient at the one place as it is at the other. The record is barren of any testimony impeaching the moral character and standing of either plaintiff or her present husband, though they are each beset with poverty as measured by ownership of this world's goods. Nevertheless, they are willing to and, according to the proof, do unitedly struggle to maintain their moral standing and to acquire enough of this world's substance to keep the wolf from the door. Both of them are yet young—the husband two years the junior of the wife. Upon the whole we have failed to discover anywhere in the entire record any fact militating in the least against the fitness and suitability of plaintiff and her young husband to become the custodian of the former's firstborn, and to be entrusted with its nurture and control, save and except that they belong to that great army of struggling humanity universally designated as "poor people"; whilst on the other hand, defendant has her head but slightly elevated above that level.

If such facts alone are sufficient to justify and authorize the courts to deprive parents of parental control of their children, then there would be a great shifting of abodes of our juvenile population, by the willing rich emptying the homes of unwilling poor parents, and thereby depriving them of their dearest God-given right, and of the solace of nurturing their offsprings, and to rear them to become exemplary citizens and members of society. But the law does not sanction, uphold or apply any such principle. In adjudging the right of custody of an infant child of tender age, consideration is given to its welfare, but the investigation is not confined alone to inquiry into the financial condition of the contenders for its custody. Its need for the soothing influence that only a parents' love and affection can give, as well as the supplying of a more or less necessity for youthful associations in the household, plus other considerations, are potential factors in making the determination. We have already seen that defendant's household is wholly barren of any such domestic association. She, though reasonably intelligent, possesses a stern and somewhat austere disposition, as is revealed by the testimony in the case. Up until a few months before giving her testimony, she, on occasions employed profane language, and she even testified that the grandson had acquired the same habit; but she claimed that she had reformed and no longer blasphemed in her conversations. She, no doubt, has become very much attached to her grandchild,—as much so as a person of her austere temperament could acquire —but we are convinced that it lacks much of the sweet, soft and tender affection that only a parent can bestow, and which plaintiff possesses, according to the testimony in the case.

The controversy, it will be perceived, is not one between parents over the right of the custody of their infant child upon separation and divorce, since they each stand before the law, with practically equal rights in such litigation. But in this case the controversy arises between the mother of the involved infant on the one side, and a stranger (so to speak), though grandmother, on the other side. The fact that the latter is grandmother of the involved child will increase her rights over and above that of an entire stranger in blood relationship to the unfortunate infant, as against one

of its parents in contests of this kind. But notwithstanding such superior right of a grandparent as compared with that of an entire stranger, the scales of justice must weight much heavier in favor of his or her right, before a parent will be deprived of its lawful right to custody and control of his or her offspring. That principle is applied by the courts in order to protect and preserve the God-given and superior right of parents in the premises. If, however, the parent possessing such right is either morally unfit or unsuitable to discharge the task—or later becomes such through his own vicious habits, or through physical or mental disease—to such an extent as that the future welfare of the child would become manifestly imperiled unless a different custodian was provided, then, and in such event only, will the universally adopted rule, supra— primarily, favoring of the parent—be disregarded. The governing rule as we have so stated it is recognized by all courts and text writers without dissent.

The substantive law as applied by this court is so forcefully and admirably stated by Judge O'Rear, a former distinguished member of it, in his opinion in the case of Stapleton v. Poynter, 111 Ky. 264, 62 S. W. 730, 23 Ky. Law Rep. 76, 53 L. R. A. 784, 98 Am. St. Rep. 411, that we incorporate in extenso his statement of the rule as made by him, in that opinion, and which is:

"The welfare of a child, its life, health, and moral and intellectual being, should be, and are, kept well in view by the courts in determining its legal disposition in litigations over it. This is not upon the ground, sometimes supposed, that courts of equity will overrule the claims of nature, or substitute their discretion as to the child's welfare for the responsibilities imposed by God upon the parent. We apprehend, and, from an examination of the authorities, we gather, this course is justified and applied only in cases where a parent asks the court to change the child's possession, basing his claim upon a legal right,—such for example, as the legal right of the parent to the custody of his child. Then, and then only, will the court look to the welfare of the child, in withholding its aid; basing its action upon the principle that equity will not do a wrong to aid a mere naked legal right. By statutory enactment the legislatures have provided for the state's taking charge of infants in extreme cases; but nowhere has it been held, so

far as we are aware, that a parent, however indigent and ignorant, or even vicious, can be deprived by law of the custody of his child at the suit of a stranger, however opulent, charitably disposed, and prepared he may be to give the child advantage of coveted opportunities for its moral or intellectual development. The day may come when society will demand and exercise some such right. Perhaps it may be recognized in milder form by some in legislation for compulsory attendance at schools. But, in the broad sense suggested, it certainly is not here yet. We hold that when it is shown by the suing claimant parent that he or she is a person of moral habits, of good health (that is, without contagious or infectious disease), and of enough industry to reasonably insure the child from want and positive distress, these conditions, coupled with the parent's legal right, will overcome the supposed advantages accruing to the child by the adverse claimant, a stranger, who merely shows that he possesses fortune, character, kindliness, and affection for the child; and that, too, even though the court might well consider that the opportunities afforded by the stranger are the most favorable for the infant's welfare. The experience in this country is not that wealth, especially when coupled with indulgence, is always most conducive to a useful education and the foundation of the best character. We apprehend that the best part of the child's education will not be obtained at some ideal social institute, though beginning with a kindergarten and ending with a university, but generally at the hearthstone of its family, if that family be a proper one. The welfare of the child is not merely training its head, but includes training its heart. Wisdom may be imparted by teaching it to think; the feelings that at last make a man, by teaching it to feel. Orphanage, even partial, is generally conceded to be a misfortune, and universally moves to pity, but it likewise carries a privilege and an opportunity. The boy who, taught by the stern lessons of necessity and the inscrutable ties of fellow suffering and gratitude to revere his mother, and to help her bear the burdens of widowhood and overcome the adversities of untoward conditions, has accumulated an asset of more value, perhaps, than had his disappointed benefactor been allowed to exploit his plans of education at the sacrifice of filial devotion. 'Honor thy father and they mother' is a

command, followed by a promise, of peculiar value in determining the welfare of the child. It is argued, and in some instances has been held, that the wishes or election of the infant will be regarded in determining this question. Generally those instances where the wishes of a child of sufficient maturity to realize in a measure its situation have been allowed to control were either in a controversy between parents upon their separation, or where the facts of welfare were so nearly balanced as to leave the court in grave doubt, in which case the wishes of the child were consulted and given some weight. However, it has not been held anywhere, so far as we have been cited, that the judgment of the infant is to control independent of or despite other cirsumstances. We hold that an infant can not dispose of his property of the smallest value, or become bound by contract generally, because of the conclusive presumption that he has not a sufficiently matured judgment to know what his interests are. We cannot, therefore, hold that the determination of a question involving such serious and permanent importance to him as the training of his youth should be at his disposal.

"The contract relied upon, in so far as it purports to bind appellee, having been entered into by her while under the legal disability of coverture, was not binding upon her. It was void. We are unable to distinguish it, so far as affecting the feme covert's contractual ability, from any other contract relating to her legal or property rights. If the paper ever had any legal value, it was only to the extent of transferring the legal right of the father to the custody of his infants. It could convey, at most, only such right as he held, which, of course, terminated with his death. Thereupon the mother's right of exclusive possession began.

"The record discloses that appellants are estimable and worthy old people, who doubtless would bestow on this grandchild every fair opportunity within their power for its material advancement. Their love for it, natural and cultivated, is clearly shown by the circumstances put in evidence. The separation decreed by the circuit court must seem to them, viewed from their standpoint, as a hardship. These facts are argued by their counsel here as presenting an equity entitled to be regarded by the court, in connection with the child's welfare, in decreeing its custody. The utmost the court

could be expected to do would be to measure the equities of these contending parties. It requires no judicial determination to properly estimate the mother's love,— probably the strongest instinct of the species. This temporary separation, enforced by conditions beyond her control, instead of weaning her from the child, appears to have intensified her yearning. As between the two,—the grandparents and the mother,—we do not feel at liberty to change the responsibility of the parent, and the privilege and duty of the child, from where God has placed them."

Other cases dealing with the same questions, and strictly adhering to the rule as stated, are: Mason v. Williams, 165 Ky. 331, 176 S. W. 1171; Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358; Walker v. Crockett, 194 Ky. 531, 240 S. W. 35; Scott v. Kirkpatrick, 205 Ky. 700, 266 S. W. 390; Hampton v. Alcorn, 213 Ky. 599, 281 S. W. 540; Moore et ux. v. Smith, 228 Ky. 286, 14 S. W. (2d) 1072; Baker v. Coleman, 229 Ky. 473, 17 S. W. (2d) 417; Cummins v. Bird, 230 Ky. 296, 19 S. W. (2d) 959; Thompson v. Childers, 231 Ky. 179, 21 S. W. (2d) 247; Matlock v. Elam, 262 Ky. 631, 90 S. W. (2d) 1015; Bedford v. Hamilton, 153 Ky. 429, 155 S. W. 1128, and Strangway v. Allen, 194 Ky. 681, 240, 384. In some of them, including the Mason v. Williams case, the question arose between parents and grandparents the same as in this one, in none of them did this court intimate a willingness to depart from the doctrine as so succinctly stated by Judge O'Rear in the Stapleton opinion, nor in any of them did the court allow the poverty of the parent to alone influence the decision in his or her favor. On the contrary, it will be found on reading those opinions that in every case where a parent was disallowed the custody of his or her child—and where it was given to a stranger—other potential considerations appeared and were indisputably present. As said, supra, if the parent becomes either physically or mentally unable to discharge the task set before him with reference to his infant child; or if he or she has already acquired (or later acquires) immoral habits or vicious practices to such an extent as to seriously interfere with or to destroy entirely the parent's ability to discharge that task—such as becoming an out-law, lascivious or lewd conduct, or hopeless inebriety,—then and in that event the parent's superior right will be sub-

ordinated and the infant's custody placed with others who are not so deficient.

We recognize that both appellee and her grandson are mutually attached to each other and that our conclusion will result in more or less tearing of heart-strings as a result of their separation; but it should be remembered that plaintiff, the mother, has been suffering from the same cause continuously since she began efforts to obtain the custody of her child, and whichever direction that the facts may have directed the determination of the contested question, there would be heartaches resulting therefrom. Hence, our statement at the beginning of this opinion that we would have much preferred to have been relieved of the task. We also have not overlooked the fact that the special judge who tried this case was once an honored member of this court and performed his duties as such admirably and efficiently; that he also served his constituency as judge of his judicial district before becoming a member of this court; but, notwithstanding such considerations, our interpretation of the law as enunciated in our cases referred to and elsewhere convinces us that he erred in adjudging the custody of the child to the defendant, and that his determination should have been made in favor of plaintiff.

Wherefore, for reasons stated, the judgment is reversed, with directions to set it aside, and to render one in conformity with this opinion; the whole Court sitting.