## Bridges v. Matthews.

Dec. 16, 1938.

J. R. WHITE, RICHARD L. GARNETT and C. B. LATIMER for appellant.

E. H. SMITH, TERRY L. HATCHETT and GEORGE J. ELLIS, JR. for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

We are faced with the unpleasant task of deciding whether the parent or grandparent is entitled to the custody of a child.

The appellant, J. G. Bridges, married Sabra Matthews, the daughter of appellee, Nettie Matthews, and to this marriage one child, Robert Ellis Bridges, was born July 12, 1926. Sabra Matthews died January 28, 1930, in Gary, Indiana, where her husband was employed. She was buried at Glasgow, Kentucky, and a few days after the funeral appellant returned to Gary, Indiana, leaving his child with the latter's grandmother, Nettie Matthews. For several years thereafter appellant had no regular employment, but worked from time to time in Kansas, Illinois, Indiana, and Ohio. He married in October, 1935, and since then he and his wife have lived in Newport, Kentucky, where he is regularly employed as a truck driver. His wages average about $125 a month. On June 26, 1936, he brought this action in the Barren circuit court against Nettie Matthews, alleging that he was a moral, sober, discreet, and fit person to have the care and custody of his child, Robert Ellis Bridges, and asking for a mandatory injunction requiring the defendant to surrender the child to him. In her answer, the defendant pleaded and relied upon a contract, alleged to have been entered into a few days after her daughter's death, by which appellant gave to her the care and custody of the child upon condition that she would rear him. She also alleged that it was essential to the future welfare of the child that his care and custody should be retained by her. The suitability and fitness of appellant to have the custody and control of the child was contested, but the proof shows he is sober, honest, and industrious, and a fit and proper person to have charge of his child. His wife is a woman of exemplary character. A large amount of proof was taken, much of it directed to the suitability of the respective parties to have the custody of the child, but the only matters worthy of consideration are the alleged contract concerning the child's custody and the effect to be given to it, and the welfare of the child. The chancellor found that appellant and appellee entered into an agreement shortly after the death of the child's mother whereby the appellee should take the child and rear him and have custody of him. He also found that the welfare of the child would be better served by leaving him with his grandmother.

The appellee lives in a four-room cottage situated five miles from the city of Glasgow. Her daughter, Clarine Matthews, and her son, Virgil Kincheloe, half

uncle of Robert Ellis Bridges, live with her. The appellee was 57 years of age when her deposition was taken. The title to the house and 1½ acres of land on which it is located is in the appellee's son and daughter, who contribute out of their earnings to the support of the family. Clarine Matthews works at a garment factory in Glasgow and earns $11 to $13 a week, while Virgil Kincheloe works at a sawmill and earns $12 a week. Their home is located in a good neighborhood, near a school and church, and the proof shows they have provided amply for the comfort of Robert Ellis Bridges during all the time he has lived with them. The appellee, her son and daughter, though poor, are persons of good moral character, and are devoted to the child and he to them. When Robert Bridges was asked if he wanted to go to Newport and live with his father and stepmother, he replied: "No, sir; I had rather die than to go." The appellee testified as follows concerning the alleged contract:

"Q. How long has Robert Ellis Bridges been living with you? A. Seven years.

"Q. Tell the circumstances under which he came to live with you Mrs. Matthews. A. Well, when my daughter died and when she was buried, Garland stayed in a few days and he was going back to his home in Gary, Indiana. I was sitting by the stove in my room giving Robert a bath, and Garland said 'Well, it will be kinda hard to go back without Sabra or Robert either,' and I said, 'Oh! are you going to leave Robert with me?' He said, 'Yes, Sabra has told me several times that if you outlive me, I want Mama to have Robert,' and of course, I was glad, and Garland said he wanted me to have him too. Garland, you said it child to me that morning that you left for Gary.

"Q. Did you rely upon his promise to leave the child with you? A. Yes.

"Q. What did he say in promising to leave that child with you? I mean what did Garland Bridges say? A. Well, he said he wanted me to have him too; that he wanted me to raise him; that he could be better satisfied with Robert with me than he could with anyone else.

"Q. Did he say anything at all about whether

he was coming back for him? A. No, and of course, after Garland went home, it might have been two weeks, he sent Sabra's trunk and all of Robert's clothes and playpretties, and of course, I taken it for granted, of course, that he meant what he told me."

Appellant denied that such a contract was made, but we are not disposed to disturb the chancellor's finding in that respect. Conceding for present purposes that the contract was made as claimed by appellee, it appears that she, aided by her son and daughter, has faithfully performed the duties ordinarily incumbent upon a parent. The child has had a happy home life, has been surrounded with wholesome influences, and his affection for his grandmother, uncle, and aunt is deep and sincere. Speaking of their care of him, the chancellor, in his opinion, said:

"The boy shows the results of their training and appears to be a fine, manly, healthy little fellow who will be much better off in this country home than he would be in the custody of the plaintiff."

The appellant, probably through no fault of his own, has seen little of his child during the last nine years, and has been able to contribute only nominally to his support. Now that he has a home and is able to support his child, it is only natural that he should desire to regain his possession, but, under the circumstances of this case, the child's welfare is the paramount fact to be considered. Section 2016 of the Kentucky Statutes provides that the surviving parent, if suited to the trust, shall have the custody, nurture, and education of his or her infant child, and this court has rarely given the custody of a child to a grandparent or stranger in preference to the parent. Johnson v. Cook, 274 Ky. 841, 120 S. W. (2d) 675, and cases therein cited. In Thompson v. Childers, 231 Ky. 179, 21 S. W. (2d) 247, a contract whereby a father surrendered the custody of his children to others was upheld, and, in the opinion, it was said that once having surrendered possession of children voluntarily and freely a parent may not take them away from those to whom he surrendered them without first showing that it would be for the best interest of the children to do so. The evidence in this case shows that the child, now 12½ years of age, has a good home in a good community, and that those with whom

he has lived nearly all of his life are devoted to him and willingly performing for his welfare all that could be desired. He is a bright, intelligent boy, and happily situated. He has reached the age where it would be difficult for him to adjust himself to new surroundings completely at variance with those with which he has been familiar. He expressed a strong desire to remain with his grandmother, and, under the circumstances of this case, his desire should be given great weight. In Cummins v. Bird, 230 Ky. 296, 19 S. W. (2d) 959, this court adjudged that the maternal grandfather was entitled to the custody of a 12 year old child as against the father, and the desire of the child was the decisive factor in the case. What was said in the opinion in that case is peculiarly applicable here [page 962]:

"The duty of denying to a father the custody of his child is a serious and solemn one, but when the father for years has relegated to others his duties and responsibilities respecting the child, and when those others, actuated by love and affected by the ties of kindred, have accepted the responsibilities and performed the duties thus thrust upon them, their rights are not to be ignored, but should be preserved, unless the change proposed is consistent with the legal rights and would benefit the child, which is always the peculiar care of the court. This record not only fails to show that the child's welfare would be promoted by a change in her custody, but makes it clear beyond cavil that her supreme good will be subserved, and the legal rights of the litigants preserved, by permitting the existing situation of the child to remain undisturbed."

If sympathy for appellant in his natural desire to have the companionship and care of his son would control, the prayer of his petition would be granted, but a still more sacred consideration must direct our judgment. The controlling consideration is the welfare of the child. Here the child has been separated from his father since early infancy, and obviously has transferred his interests and affections to his present home and those who compose the family of which he is now a member. Undoubtedly, it would be a serious injury to him to sever the ties that now bind him to his surroundings and those whom he loves. After a careful consideration of the record, we have concluded that the chan-

cellor correctly adjudged the custody of the child to the appellee.

The judgment is affirmed.