## Ridgeway et al. v. Walter et al.

Nov. 17, 1939.

T. C. Carroll, Lindsay Ridgway, J. Smith Hays, Jr., and Benton & Davis for appellant.

D. L. Pendleton and Harvey T. Lisle for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Two of the appellants (who were also two of the plaintiffs below), Samuel H. Ridgeway and Marguerite Ridgeway, are husband and wife, residing in Shepherdsville, Kentucky. They are each sixty-odd years of age— the husband being a physician, busily engaged in the practice of his profession in the vicinity of his residence. The other appellant and plaintiff below, Billy Howard

Smith, is an infant lacking only about one month of being six years of age when this action was filed. He is the grandson of his co-plaintiffs, Samuel H. and Marguerite Ridgeway, whose daughter some years ago married one Ike Smith, a farmer, trader and speculator residing in Clark County, Kentucky.

The corporeal custody and rearing of the grandson Billy Howard Smith—whom we will hereafter refer to as "Billy Howard"—is the sole subject matter of this litigation. His mother, the daughter of the two Ridgeways, died on December 24, 1938, which was followed by the death of her surviving husband on March 30, 1939, leaving an only child, Billy Howard, as his sole heir. The father left no will but he owned and possessed at the time of his death real estate and personal property the aggregate value of which was and is at least $75,000. A considerable part of it consisted in a valuable farm in Clark County, Kentucky, located on State Highway No. 60, and some five miles west of the city of Winchester. Upon it there was at the time of his death, besides his residence, a number of tourists' cabins, and what has come to be termed a "roadhouse," at which liquors were dispensed, meals furnished, and other entertainments provided for the "wayfaring man."

Mrs. Ike Smith was the only daughter of Dr. and Mrs. Ridgeway, but they have an unmarried son, who is about 35 years of age and now engaged in an honorable and lucrative business in the city of Atlanta, Georgia, and who is shown in this record to possess high qualities of citizenship inherited from his parents who occupy the same social standing in their community. Prior to the deaths of Billy Howard's parents he and they frequently visited the home of the Ridgeways, some of which were protracted for as much as a week; whilst the Ridgeways also visited their daughter and her husband at their home in Clark County. Billy Howard in the meantime learned to designate his maternal grandparents by the pet names of "Daddy Mouse" and "Mamma Ridge," and he always so referred to them, thus indicating great affection for both. Ike Smith lingered for some considerable period after becoming bedfast from his fatal illness, during which period one or the other, and sometimes both, of the Ridgeways visited him at more or less frequent intervals. They were both there on the day of his death, which occurred in the forenoon of March 30, 1939. Later in the day they returned to their

home in Shepherdsville after the funeral was fixed for the following Saturday—with the intention, of course, of returning for the funeral on that day, which they did.

Ike Smith had a brother, the defendant, Jake Smith, who resides in Wyoming, where he owns and operates some kind of ranch located some twenty miles from the Yellowstone National Park. The nearest schoolhouse and the nearest church thereto is located some 14 miles away. He appears to have been very much attached to his brother, Ike, and, of course, he was present during the latter's illness and at the time of his death and burial, lingering in Winchester for some days thereafter. Ike Smith also had some half brothers and sisters, two of whom resided in Clark County at the time of his death—they each being married and having several children. His parents are both living, but have long since separated and are divorced, the mother later marrying another man and resides with him in Charleston, West Virginia; whilst her first husband, and the father of Ike Smith, appears to have no settled residence—due possibly to his bad health forcing him to spend a large part of his time in Arizona. However, it appears that at the time of the death and burial of his son, Ike, he was present in Winchester, but the record does not disclose whether or not his divorced and remarried wife was present on either occasion.

On the afternoon of the day on which Ike Smith died, or the early forenoon of the next day (but in either event before he was buried), a life-long friend of his, the defendant and appellee, J. E. Walter, a resident of the city of Winchester, was, upon the recommendation of the collateral kindred of Ike Smith, appointed by the county court of Clark County administrator of Ike Smith's estate, and at the same time he was also appointed statutory guardian for Billy Howard. Each of those appointments was made in the absence of Billy Howard's maternal grandparents, and when they were absent from Clark County, but with the intention to return on the day for their son-in-law's funeral. They knew nothing of either appointment until after their son-in-law's funeral, and while they may have entertained some disappointment (especially over the guardianship of their grandson) they did not so express themselves at that time. On the contrary, they expressly approved the appointment of Walter as administrator of their son-in-law's estate, though experiencing regret

and surprise over his appointment as their grandson's guardian.

With matters in that condition the Ridgeways returned home after the funeral. However, on the following 6th of April they had occasion to be in the city of Louisville and while there they concluded to procure some gifts for Billy Howard and to take them to him in Winchester, where he was supposed to be at the home of his appointed guardian, which was in the city of Winchester, but on arrival they found him with his guardian at his father's roadhouse. After a brief meeting they requested of the guardian the privilege of taking their grandson with them to Winchester, where they intended to supply him with additional toys. They concluded to remain in Winchester for lunch and obtained consent of the guardian for Billy Howard to stay with them and to be returned later in the day. Before the time for departure they learned that the guardian had consented, and had arranged for Billy Howard to be taken by his uncle, Jake Smith, to his Wyoming ranch. That information stirred and aroused the indignation of the Ridgeways, and at the same time clouded them with grief, sorrow and regret over the impending removal of their grandson from the state of his birth and of his home continuously since then, as well as from the state in which they lived. Such a buried location in the wilds of Wyoming would have been practically as distressful to them as if he had been interred in the ground. That arousement resulted in conversations with the guardian, in which protests and objections were made by them to the contemplated removal, but to no purpose. They then consulted attorneys, which culminated in the filing of this action by them and by their grandson by his paternal grandfather as next friend, against the guardian, and the paternal uncle of his ward, Jake Smith, in which they sought an injunction against each of them restraining the removal of the ward from the state of Kentucky to the state of Wyoming, and restraining each of them from altering the ward's custody whereby the nonresident, Jake Smith, became his custodian. They likewise sought an order of the court placing the custody of their grandson with them in their home in Shepherdsville, Kentucky, alleging facts showing their supreme qualifications and superior right, both as affecting them and their infant grandson, to the latter's custody.

Defensive pleadings filed by defendants contested

the alleged right of plaintiffs to the custody of their infant grandchild, and further averred that neither the guardian, nor Jake Smith, contemplated that the latter should be permanent custodian of the ward, but that the arrangement was only for a temporary visit of the latter to the home of his uncle. Following pleadings made the issues and the court heard the case upon oral proof on the 14th of April, 1939, and upon submission the guardian was enjoined "from removing or permitting to be removed the infant, Billy Howard Smith, out of this state, except when accompanied by his guardian in person, for a temporary visit or visits." The court, however, overruled that part of the prayer of plaintiffs' petition to give them at least the temporary custody of their grandchild, and left it in custody of his guardian. From that refusal of the court plaintiffs prosecute this appeal, but neither defendant has appealed directly or by cross-appeal from that part of the judgment granting the injunction against the removal prayed for in the petition. So that, we repeat, the sole question presented by this appeal is that of the superior right of the infant to be reared in the atmosphere of the home of his maternal grandparents, and their superior right to have that task imposed upon them which they, because of deep-seated affection and ties of blood, are anxious to assume.

At the threshold of the determination of that question it should first be said that a most controlling factor with courts in solving such controversies is the welfare of the infant, into which there enters a multiplicity of facts, prominent among which is mutual affection between the ward and its would-be custodian as founded upon blood relationship, strongly stimulating in the latter the desire and determination to exert every effort of which he is capable to furnish and surround his charge with the best opportunities and influences so as to best guarantee the highest standard of citizenship when adult age is reached; whilst at the same time furnishing joy, happiness and contentment to each in the discharge of such an important task. Naturally there enters into the solution of the question, as based upon the recited considerations, the physical, mental, moral and financial ability of the proposed custodian to discharge the task he seeks to assume, as well as propitious surroundings of his home necessary for the obtention of the best results, such as schools, churches, moral atmosphere and

other conditions conducive to the proper development of the infant.

Two late domestic cases recognizing such influencing considerations that should guide the court in the proper determination of such questions, are: Johnson v. Cook, 274 Ky. 841, 120 S. W. (2d) 675, and Wacker v. Wacker, 279 Ky. 19, 129 S. W. (2d) 1043. The opinions in each of them list many others dealing with the same issue, and in all of which the influential considerations we have above expressed were emphasized and approved. To save time and space the reader is referred to those two opinions for a list of them. It will be found on reading them that the question has arisen and been determined between varied classes of claimants to the right of custody of an infant. Sometimes it was between separated parents; sometimes between statutory guardians and parents; sometimes between entire strangers, and sometimes between grandparents and parents; sometimes between grandparents and strangers, as well as between parents or grandparents and statutory guardians. But in all of them we believe it may safely be said that the ultimate controlling factor was the welfare of the infant. However, as in the Johnson case, supra, the absence of ownership of property by a contesting parent will not alone deprive him of the right of the custody of his child as against one who does possess property where the parent is both physically and mentally able to work and provide for his child, and demonstrates a willingness and determination to do so, although the question of financial standing might become a more or less controlling fact in a contest where such relationship does not exist. It will also be found that—as was also true in the Johnson case—the right given by Section 2032 of Baldwin's 1936 edition of Carroll's Kentucky Statutes, of the guardian to the custody of his ward, is not an absolute and unqualified one, but that it is subject to the consideration hereinbefore expressed and approved in that and other cases. There the contest for the custody of the involved child was between its paternal grandmother—who was also its statutory guardian—and its mother; but, notwithstanding the two facts of blood relationship of the grandmother and her being the infant's statutory guardian, we held under the proven facts that the mother possessed the superior right and the custody of her child was adjudged to her. Our conclusion was based exclusively upon the fact that

she was the mother, and that the other considerations, favoring her opportunities to properly discharge her task, were present equally as much, if not more so, than the same considerations surrounding the grandmother. In arriving at that conclusion we followed many other prior cases and which in turn was contrary to Section 2032 supra of our statutes, if it should be administered absolutely and without qualification. But in rendering such opinions we have interpreted the statute as only conferring a prima facie right of the guardian to the custody of the person of his ward, subject, however, to its being defeated by proven facts rendering it beneficial to the ward that it should be otherwise.

Such determinations not only evidence this court's interpretation of the statute but declare the rule by which it should be guided where a parent is involved, and which are in accord with the teachings of text writers and adjudications of other courts, as will be seen from the texts in 28 C. J. 1111, Section 173, saying: "So far as the natural parents are concerned it is usually held that their right to custody of their child is superior to any right of the guardian." Many cases from various courts are cited in note 42 to that section, two of which are Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358, and Mason v. Williams, 165 Ky. 331, 176 S. W. 1171. Such of our opinions, whereby the right of the guardian to the custody of his ward was made to surrender to the claims of others, is likewise in accord with recognized texts and opinions of other courts, as will be seen from the text in 31 C. J. 990, Section 8, saying: "The right of a guardian, or of parents, to the custody of the ward or child, is not absolute. The state in its capacity of parens patriæ may assume direction, control, and custody of his person, and delegate such authority to whom it may see fit." In the next section, and on the same page, this appears: "An infant is considered as a ward of the court having jurisdiction of his person, particularly all courts of equity; and the institution of any proceedings affecting his person is sufficient to make him a ward of court. The matter of his custody is subject to control by the court, exercising its judicial discretion." That text is in accord with our previous determinations of the rights of parties in such contests, and has become our guiding rule, notwithstanding the apparent absolute terms of our statute, supra.

Having thus determined the principles by which we

should be controlled, we will now make a brief survey of the facts so as to determine the question as presented in this case in accordance with the law as so declared. To begin with, the controversy is exclusively between grandparents and the guardian, who is wholly unrelated to the orphaned infant. His only right to its custody is founded on the fact that he was appointed guardian by the Clark county court in the hurried and secret manner in which it was done. Such precipitate action calls for explanation to show that some ulterior purpose was not lingering in the offing, or, in less polite parlance, that there was not "an Ethiopian in the wood-pile." Plaintiffs, as contestants of their right of custody, are affectionate maternal grandparents who are shown to have been attached to their grandson by ties of blood and by cords as strong or, perhaps, stronger than were possessed by his late deceased father. Equally so is the affection of the child for those same grandparents to whom he applied his more or less affectionate pet names, which evidenced his realization of the ones whose love and affection and tender care he most appreciated, and in the surroundings of whose home he experienced more joy and happiness than that of any other living individual at the time of the dark lantern proceedings by which the appointed guardian became clothed with his statutory authority.

In the Johnson case we recognized that, next to parents, a grandparent was prima facie the one who should have custody of the infant ward, but that the right of such one was inferior to the same right of his parent. Nevertheless it was made plainly inferable by that opinion—which is fortified by texts and other adjudications—that all things else being equal the prima facie right of a grandparent to the custody of his or her grandchild is superior to that of a stranger in blood, although the latter may be its statutory guardian. Not only are "all things else equal" in this case, but they preponderate in favor of the right of the grandparents, as is plainly shown by the testimony heard upon the trial. The proof shows preeminently their suitability in every respect to discharge the burden and task, the assumption of which is prompted by their deep-seated love and affection, based upon their blood relation.

But the suitability of the guardian to properly discharge that task is, to say the least, doubtful. We do not find, nor is there anything in the record to indicate,

that the guardian is not an upright citizen with ample material facilities for the discharge of the duties he asserts, but a most important fact is lacking, and which is the proper esteem and consideration for the future welfare of his ward, which is demonstrated by the fact of his indifference to the presence and companionship of his ward as a member of his family, and his ready willingness to surrender such association to a non-resident of the state and to consign him to a bleak prairie home in the distant state of Wyoming. We so determine chiefly from the undeniable fact that before the funeral and burial of the infant's father negotiations were developed into an agreed consent by which the ward should be taken out of the home of the guardian and sent to a distant state, which the proof shows is, at present at least, without school or church facilities that the infant might attend in acquiring needed moral and educational training. Not only so, but in order to place him in a position prima facie possessing the right to so agree (his appointment) he offered no one as his surety, either as administrator or guardian, except a non-resident, who was a disqualified surety and should never have been accepted by the Clark County Court. Both the guardian and the non-resident brother, Jake Smith, may be successful business men and may deport themselves in their respective communities as respected citizens—and which the record discloses is true—but the action of the guardian as above outlined, leaving out all other considerations, shows a disinclination to personally supervise the rearing of his friend's offspring, and to not desire the presence of that offspring, as a member of his family to whom he might affectionately administer the necessary attention and care to develop him into an upright citizen.

The insistence of defendants that the delivery of Billy Howard to his uncle Jake—and the agreement for him to be taken to his uncle's home—was only for the purpose of a temporary visit is, as we conclude from the testimony, unsustained. There are a number of facts appearing in the proof which clearly indicate a permanent removal, and we are convinced that the "temporary visit" theory was an afterthought gotten up for the purpose of meeting the legal objection to the removal of the infant ward out of the jurisdiction of Kentucky.

There are other facts that might be adverted to more or less fortifying our determination of the involved

150

issue; but what we have already said is, as we conclude, amply sufficient to demonstrate that the court was in error when it denied the right of plaintiffs (the two Ridgeways) to take, at least, temporary control and possession of the person of the infant ward.

Wherefore, the judgment is reversed, with directions to modify the injunction so as to disallow the right of the guardian to take his infant ward out of the state of Kentucky without the consent of its grandparents, the adjudged custodians in this opinion, and with direction to sustain the prayer of the petition by upholding the right of plaintiffs to the personal custody of the infant ward, and directing that he be delivered to them until future circumstances may require a modification of the order, and for other proceedings not inconsistent with this opinion.

The whole Court sitting.