## Staggs v. Sparks et ux.

March 21, 1941.

Edward C. O'Rear, Allen Prewitt and Reid Prewitt for appellant.

James C. Clay and S. S. Willis for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

This equity action—filed in the Rowan circuit court

by appellant and plaintiff below, Hilton Staggs, against appellees and defendants below, U. S. Sparks and wife—involves the ever-recurring question of the right of custody of an infant of tender (seven) years. In this case plaintiff is the father of the child; whilst defendants are its maternal grandparents to whom the court adjudged its custody. Such disputes arise out of different relationships sustained by the contestants and litigants to the involved infant, i. e., between statutory guardian and parents, or grandparents; between grandparents and parents, and between parents when they become separated, whether divorced or undivorced. Some of the many cases brought to and determined by this court, in which the right to the custody of the infant in the case was determined as between the different classes of contenders supra, are, Stapleton v. Poynter, 111 Ky. 264, 62 S. W., 730, 23 Ky. Law Rep. 76, 53 L. R. A. 784, 98 Am. St. Rep. 411; Bedford v. Hamilton, 153 Ky. 429, 155 S. W. 1128; Mason v. Williams, 165 Ky. 331, 176 S. W. 1171; Edleson v. Edleson, 179 Ky. 300, 200 S. W. 625, 2 A. L. R. 689; Vanover v. Johnson, 201 Ky. 302, 256 S. W. 422; Scott v. Kirkpatrick, 205 Ky. 700, 266 S. W. 390; Chance v. Pigneguy, 212 Ky. 430, 279 S. W. 640; Shelton v. Hensley, 221 Ky. 808, 299 S. W. 979; Baker v. Coleman, 229 Ky. 473, 17 S. W. (2d) 417; Cummins v. Bird, 230 Ky. 296, 19 S. W. (2d) 959; Johnson v. Cook, 274 Ky. 841, 120 S. W. (2d) 675; Bridges v. Matthews, 276 Ky. 59, 122 S. W. (2d) 1021, and Ridgeway v. Walter, 281 Ky. 140, 133 S. W. (2d) 748.

Those opinions, involving one or more of the relationships referred to, cluster around Section 2016 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes, prescribing that parents are primarily given preference to the custody of their children, but with the controlling qualification that the welfare of the child (present or future) shall at least take precedence and subordinate all other claims to its custody where there is no difference in other claims (or practically none) affecting the future welfare of the infant in whomsoever his custody may be adjudged. Therefore, each case must be and is determined upon its own facts as developed by the testimony adduced at the trial.

Plaintiff at the time of the trial of this case was some thirty odd years of age, whilst the defendants are each sixty odd years of age and reside in Morehead,

Kentucky—plaintiff residing in Versailles, Kentucky, where he was located as an employee of the State Highway Department at a salary of $180 per month—his job being connected with the Laboratory Department of the Highway Commission. Some few years prior to the filing of this action plaintiff—who was reared in Salt Lick, Kentucky—married the daughter of defendants, and to them was born the involved infant, whose pet name is Dickie Staggs. About two and a half or three years before the filing of the action Dickie's mother died and plaintiff, as his surviving father, delivered him to defendants and placed him in their home in Morehead; but the terms upon which that was done is the chief factual contest in this litigation—defendants contending that he by parol delivered the custody of his child and their grandchild to them permanently; whilst plaintiff insists that he did so only temporarily until his surroundings became such as to enable him to discharge that duty himself. We will not go into the details of the testimony bearing upon that issue. Suffice it to say that the contention of defendants is supported by a greater number of witnesses than is the one made by plaintiff; but many of defendants' witnesses are not only closely related to them, but are themselves, on account of their affection for the child, largely interested in its custody to continue with its grandparents. With the testimony on that issue in that condition we have concluded to determine the case from the standpoint of defendants' contention—i. e., that plaintiff delivered to them the permanent custody of his infant child, although the testimony creates grave doubt of the correctness of that conclusion.

Some two years, or slightly more, after the child's custody was placed with its grandparents plaintiff remarried and provided a home for himself and newly married wife, with the latter's young child by a former husband. Their neighbors prove them to possess a most enviable character in their community for morals, uprightness and other qualities going to make up substantial citizenship, although there is some testimony that in earlier life plaintiff drank to some extent. But his indulgence in that respect seems to have been confined to the consumption of beer instead of distilled liquors. However, at that time he appears to have indulged in the practice only to a moderate degree and not at any time with the thirst of an inebriate, and his indulgence

even to that extent is shown to have been curtailed almost to the point of total abstinence. He and his present wife attend church and Sunday school; live in a well kept and sufficiently commodious residence; associate with the best citizens of the highly cultured town of Versailles, and a number of its most prominent citizens attest their good character in every respect. Likewise, defendants establish a good character amongst their neighbors and acquaintances, but it is prominently made to appear that the grandfather in the past, as well as at present, imbibes liquor to a more or less extent, and upon occasions becomes loaded with a surplus of that commodity, whereby it becomes necessary to obtain the assistance of a physician to enable him to emerge therefrom. His indulgence appears to be practiced in his household and the inference might well be indulged that it was done before the eyes of little Dickie. No such indulged practice is shown to exist in the household of plaintiff.

Following plaintiff's second marriage, and while the infant child was living in the home of defendants, he (the child) would visit plaintiff's home in Versailles, some of which was after he had arrived at six years of age and had attended school, thus enabling him to write in childish fashion in a letter addressed to his stepmother, to whom he became very much attached, that: "i want a dog i want some papper (paper) i want a home." His step-brother was then about four years of age and the proof shows that not only did they get along amiably and affectionately in their associations, but that the second Mrs. Staggs acquired an affection for Dickie and with her proven amiable and motherly disposition she became attached to him almost as strongly as if he were her own child. Moreover, the manner displayed by both defendants in the giving of their testimony in this case furnishes a mirror through which may be seen the extent of the amiability of their characters, and to confirm the old adage that "by their fruits ye shall know them." They conceived the idea sometime before the filing of the action that plaintiff intended to kidnap his child from them, and on some occasions they forbade him to visit his child and to secrete it from him when plaintiff would call to see him, which he did upon an average of at least twice per month, spending as much as the week-end with his offspring on each visit.

Illustrative of the difference in amiability possessed by the opposing litigants and also their recognition of the rights of others, and the disposition to extend courteous treatment in all sorts of human relations, activities and transactions, plaintiff, after remarrying and settling himself with his little family in Versailles, wrote Mr. Sparks a letter clothed in courteous and respectful language, in which he set forth his claim as well as his desire for the return of the custody of his child. In that letter he acknowledged the claims on the part of defendants for the custody and associations with his child, but in which he also calls attention that they have had his possession for over two years and that as its parent he felt like "it is impossible for me to let you keep him." He also proposed therein to let the child visit his grandparents as often as possible so as not to interfere with his schooling, and promised that he might spend the larger part of summer vacations in their home. He likewise said in that letter that "I have always thought a lot of you and I am sure you know that I do not want you to think that I will ever be in the least unfair with you about Dickie." He acknowledged the good care that defendants had bestowed upon his child while the latter was an occupant of their home, and closed his letter by saying: "There are very few fathers and sons who are as close as Dickie and I. I feel sure, Mr. Sparks, that if you will look at our side you will understand our feelings." That letter speaks for itself and draws an ineffaceable picture of the fairness and uprightness of its author.

Now let us turn to defendants' answer to that letter, which shows a vast contrast between the humane qualities of the two. In it Mr. Sparks said: "You can not have him (Dickie) except the Court says so. You may start proceedings any time you wish and if you have not guts enough to do it I will and any other proceedings that we think is just. U. S. Sparks. P. S. I am tired of this worry and the sooner it is over the better for all." That letter, besides being cold, unfeeling and brusque peremptorily and dictator fashion—discarded and ignored all apparent feelings of plaintiff for his child, and mandatorily told him that its custody was no longer his, but only that of the writer, and it finally invited plaintiff to meet the writer thereof in the court-house for a settlement of the dispute between them. It

displayed no disposition to keep such family disturbances from the public airing that would be entailed by a court proceeding, and which plaintiff's letter expressly sought to guard against.

At common law—as will be seen from the text in 46 C. J. 1231, Section 12—there existed a conflict in the opinions of courts as to whether or not a parent could legally contract or agree for another to have control and custody of his infant child. Many states, as appears in the notes to the text referred to, held that it was against public policy to permit and enforce such an agreement between the parties thereto (independently of any consideration of the infant's welfare), whilst other courts held to the contrary and enforced such agreements as between the parties, and especially when the infant's welfare would not be materially affected whichever way the determination was made. Our opinion in the Williams case, supra, seems to have favored the interpretation that such agreements were against public policy, but in that case the agreement sought to be enforced was made by the mother of the infant on her dying bed just before expiring without the knowledge or consent of her surviving husband who was then separated from her. She therein attempted to confer upon her parents the right to the custody of her infant child, and the litigation was between them and its father. We adjudged the custody to the father, who was plaintiff in the action, for reasons stated in the opinion as based upon the considerations hereinbefore referred to.

However, in some of the later domestic cases which are cited supra—one of which is Scott v. Kirkpatrick— we expressly held that such agreements will be enforced as between the immediate parties thereto, but that their rights will be subordinated to the welfare of the child, for, as all of the cases hold, its welfare should be the controlling factor even to the extent of superseding such agreements, and such was the ruling in that (Scott) case, and in others cited above. As to what enters into a determination of the ''best welfare for the child'' many facts are to be considered, prominent among which is affection between it and the one or ones having it in custody and with whom it resides; opportunities to furnish and provide the necessities of life and facilities for the obtention of an education, both literary and religious; associations tending to the proper development of the

child after reaching manhood or womanhood, and which includes the association with comrades of like age whereby essential playmates are furnished, and other considerations tending to establish better environments thrown around and about the infant whereby his better nature might be cultivated and developed into a character of usefulness and benefit to the community of which they form a part.

We have closely read the testimony in this case, as well as kept in mind that it is a contest between parent and grandparents. We have taken into consideration the ability and disposition to properly care for the infant as proven by both litigants. We have tried to draw a picture of the atmosphere that prevails in each home, and to vision as nearly as possible the developed facts bearing upon the best welfare of the innocent and orphaned infant, and we unhesitatingly conclude that the court in upholding the alleged agreement, and in awarding the custody of Dickie to his grandparents, failed to follow the law as declared in the opinions supra.

Wherefore, for the reasons stated, the judgment is reversed, with directions to set it aside and to enter one in favor of plaintiff in accordance with the prayer of his petition.