## Altemeier v. Rachford.

May 1, 1942.

William J. Deupree for appellant.

William A. Bolan for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

This is a habeas corpus proceeding in which the appellant sought, but was denied, the custody of her infant daughter, Patricia, who resides with, and is being reared by, the appellee, her paternal grandmother. The child's father died on February 20, 1942, and since it is the settled law of this jurisdiction that the surviving parent is entitled to the custody of all children born of the marriage, except where the parent is unfit for that purpose, or, consistent with the welfare of the child has waived all right by contract, or the welfare of the child, which, in any event, is controlling, demands that the custody be denied the parent, it is necessary only to inquire into the Special Chancellor's reasons for denying the writ. They may be thus summarized:

The appellant married appellee's son, Phillip Rachford, in June, 1933, and resided in part of the house occupied by appellee until appellant left him and returned to the home of her mother on June 30, 1936. On January 22, 1937, she sued her husband for divorce on the ground of cruelty, and was granted a divorce on May 17, 1938. The action was uncontested, and the Court reserved the question of the child's custody. Hence the child remained with her father at the home of her grandmother. We quote the following from the opinion:

"The proof shows that the infant, Patricia Marie Rachford, has lived in the grandmother's home since its birth and was under the supervision and care of its grandmother, the grandmother taking care of it as one of her own and further that since the divorce was granted, the mother has at no time previous to the death of the father of the child ever asked the court to award the custody of the child to her and the evidence further shows that she only attempted to see the child on two occasions each year, to wit: Easter and Christmas, and then for only a short period of time. At no time did she ever make an effort to have the Court that tried the divorce case award her custody of the child, although she remarried and had the same home that she is now proposing to take the child to. She did testify that the rea-

son she did not take the child with her in 1936 when she abandoned the child was due to the fact that she had to return to her mother's home and that it was not a proper place to take said child.

"The evidence further shows that the child has had a happy home life with its grandmother and has been surrounded with wholesome influence and her affections for the grandmother are deep and sincere."

The opinion then recites that the Court privately questioned the child who begged to be allowed to remain with her grandmother and continue in her school.

It will be observed that the Court's findings included no statement relative to the present ability of the appellant to provide a proper home for her children. Neither does it disclose the circumstances under which appellant left her mother-in-law's house, or her reasons for not taking the child with her. Nor do we think that the evidence justified the conclusion that appellant attempted to see her daughter only on two occasions each year, or the intimation that appellant's mother's home was not a "proper place" to take the child, if that phrase was used to denote other than that the home was impoverished.

In our view, the evidence compels the conclusion that appellant was justified by her former husband's drunkenness, cruelty, and attempts to kill her, in leaving him; and, by her inability to support her child and at the same time eke out a living for herself, in leaving it at the home of its grandmother who she knew would provide it with adequate food, shelter, and clothing. It is true that appellee and her children who reside with her deny that appellant's former husband mistreated her, but his drunkenness is not denied, nor is the fact that two weeks before the baby was born, the police were called to quiet him, and, according to appellant, to prevent him from shooting her. Neither is it denied that he failed to provide support for either his wife or child; and the record in the divorce suit shows that no alimony or maintenance for either of them was asked or granted. She testified that she was compelled to work in order to support herself after the separation; that she wanted to take her child with her as soon as she was able to obtain work, but was forcibly prevented from doing so; that immediately following the separation she saw the child

once a week, and thereafter once a month until the year 1941, during which, because of her condition she was unable to see the child so frequently. Her testimony that she was cruelly treated by her former husband is corroborated by witnesses who saw his marks of violence upon her. Asked if she had told appellee's unmarried daughter that she did not want the child, she answered: "If I didn't want her I would not have tried to get her time and time again. If I didn't want her I wouldn't have tried to get her back again." Asked why she did not take her baby with her when she left, she replied: "I didn't have a job. I didn't have any money. My mother didn't have any money. I thought if I took the baby she would get rickets doing without the proper food."

There was testimony that prior to the separation, she sometimes stayed out until two or three o'clock in the morning, but she explained, without contradiction, that on these occasions she had a "job at the ball park at the night game selling soft drinks" in order to earn money to supply her family's needs. Although it is intimated that she was too friendly with her second husband prior to her separation from her first husband, there is no testimony indicating that she bears other than an excellent reputation or that her conduct, since her second marriage at least, is not above reproach.

She married her second husband in 1939, and eight days after her first husband's death she instituted this proceeding to obtain the custody of her child. Her explanation of her failure to attempt to obtain its custody by re-opening the divorce proceedings is that she was afraid her husband would shoot her and the baby if she did so. She now has another daughter, a year and a half old, born of her second marriage. She resides in a modern apartment in a good neighborhood in Cincinnati. Her present husband earns a salary of $140 per month, and testified that he was more than willing to provide a home for and educate her child as his own.

While appellee appears to be a sincere and devoted grandmother, providing to the best of her ability for the proper up-bringing and education of her grandchild, there is nothing in the record which suggests that her home is in any respect more desirable or suitable for Patricia than that which her mother is now able to provide for her, or that appellee has the financial resources to provide her with more of the world's goods. Though

we are reluctant to sever the tie created by the grandmother's devotion, we find nothing to sustain the contention that the child's welfare would be promoted by denying the superior right of her mother to her custody.

Kentucky Statutes Section 2016 provides in part: "That the father and mother shall have the joint custody, nurture and education of their infant child, or children, and in the event of the death of either one of the parents, father or mother, the survivor, if suited to the trust, shall have the custody, nurture and education of such infant child or children."

The principles of law derivable from the Statute and referred to at the outset of this opinion are fully discussed in Staggs v. Sparks et ux., 286 Ky. 398, 150 S. W. (2d) 690, and the authorities there cited.

Judgment reversed with directions to grant the prayer of the petition.