## Noble et al. v. Noble.

Dec. 15, 1942.

434

Grannis A. Bach for appellants.

O. J. Cockrell for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE PERRY—Reversing.

This appeal imposes upon us the unpleasant and delicate task of deciding a controversy which has arisen between the mother and paternal grandparents of Eva Noble, a sickly child now eleven years of age, as to who of them has the right to her care, custody and control.

The factual background out of which this unhappy situation and controversy has arisen, as revealed by the record, is that about the year 1926 the mother and appellee, Clora Noble, married Bent Noble, a son of the appellants, Bud Noble and wife, and that three children were born to their marriage, of whom only Eva Noble, the youngest, whose custody is here involved, has survived.

It further appears that Eva's parents, after living together for some five or six years in Knott county, Ky., in 1931 separated. For what cause or by whose fault the separation was brought about is not shown, nor is that matter material to our decision of the only question here presented.

Shortly following their separation the mother, Clora Noble, taking her baby, then only some two months old, with her, went to make her home with her mother, who it appears was then living in the adjacent county of Breathitt.

It further appears that while this situation continued, the appellant, Bud Noble, made a trip over to Breathitt county to discuss with Clora Noble and her mother the matter of her turning over to him and his wife the care and custody of Eva, then a baby but eleven months old, to rear and nurture in their home, when, after such matter was fully discussed, the appellee, Clora Noble, acting in accord with the advice of her mother, assented to his proposition and voluntarily agreed to and did give over to appellants her baby's care and custody, upon the consideration that they, its paternal grandpar-

ents, would maintain, care for and rear her in their home. Thereupon, the appellant, Bud Noble, carried her to his nearby home in the adjacent county of Knott, where she has since remained for some ten years, during which she has been maintained, reared and tenderly cared for by her grandparents as a member of their small household and treated just as if she were in fact their own child.

Some two years after Eva was thus given the appellants, or in June, 1933, the child's parents having continued to live apart, the mother, Clora Noble, filed suit in the Breathitt circuit court, seeking a divorce from her husband, Bent Noble, in which action the court, on July 10 following, entered a judgment divorcing the parents and further providing that their infant child, Eva Noble, then about two and a half years old, should remain in the care and custody of the appellants, her paternal grandparents, to nurture and rear until the further orders of the court. No statement was made by the court in its judgment as to the ground upon which the custody of the child was awarded to the grandparents, but obviously it was based upon its findings that the mother had voluntarily given her to them to rear and that their care and custody of her was such as was for the best interests of the child and was also apparently agreed to by her father and in accord with his wishes, and without objection on the part of the mother.

However, on August 16, 1941, some eight years after the rendition of this divorce judgment so awarding the child's custody and throughout which long period Eva had lived with and been supported by her grandparents and had become devoted to them and also practically a stranger to her mother, the latter having thus belatedly become desirous of repossessing her child, she filed a motion in her original divorce action, asking the court to modify its previous judgment, awarding the custody and control of the child to its grandparents, to the extent that its custody and control be granted to her as its mother.

The cause coming on to be heard on this motion, the learned chancellor, after hearing the evidence, sustained it in part or to the extent of ordering that so much of the former judgment as awarded to Bud Noble and wife the exclusive control of the said infant be modified and that Clora Noble, the mother of Eva Noble, be awarded the

custody of the child for and during the school term and the remainder of said time that the child should remain in the custody of her paternal grandparents, Bud Noble and wife, "subject, however, to the visitation at all reasonable times of either of the parties, including the parents or grandparents."

Feeling aggrieved by this ruling, the grandparents prosecute this appeal, contending that they should not be now deprived of the care and custody of the little girl, who during this long period had become accustomed to their home and grown to love and be loved by her grandparents as their child.

According to the testimony of the parties, it is shown that at about the time Eva's parents were divorced in 1933, as stated, her mother, Clora Noble, married her present or second husband, Henry Noble, when soon thereafter they moved to West Virginia, where they have since continued to and do now live in a farm home owned by the appellee, situated near the town of Cowan and also near the Cherry River Lumber Co. and certain coal mines, by whom and in which Henry Noble has for years been and is now regularly employed at good wages amounting to some $225 a month. Also it appears that three children have been born to their marriage, whose ages range from four to eight.

Further it is disclosed by the testimony that both Clora Noble and her present husband, Henry Noble, were born and reared in Breathitt county, where their parents and many of their kinsmen continue to live and it appears they have regularly, since their marriage and residence in West Virginia, made annual return visits to their homes in Breathitt county, during which, the mother testifies, she would always visit, for a day or two, her little girl at the nearby home of her grandparents in Knott county, where and with whom she has continuously lived as a member of their household since she was, in 1931, given them voluntarily by her mother, with the exception of the last five months, which she spent in the home of her mother, to which she had been taken, with the appellants' consent, because of the child's late serious illness, for the purpose of there receiving hoped for beneficial medical treatment by doctors recommended by the mother. Following this period of treatment, the mother and stepfather, together with Eva, made a re-

turn visit to the homes of their kinsmen in Breathitt county, when, at the special request of the child, she was permitted by her mother to return to the home of her grandparents in Knott county, where she resumed her home with them.

The testimony further shows that the grandparents had also, prior to Eva's going to her mother's home for treatment, observed that their little granddaughter's health had for the last year or two been seriously declining and that she was afflicted with a "leaking" and enlarged heart and they had become very anxious and apprehensive over her critical health condition, for which they proceeded to have her treated by several of their best local doctors and also gave her hospitalization and special treatment for several months by an outstanding physician at Hazard, Ky. However, only after the child had failed to show any marked improvement of condition from the several months of local treatment thus given her by her grandparents did they consent to the mother's suggestion and request that they permit her to take Eva to her West Virginia home, where she told them she thought she could procure beneficial and helpful treatment for her.

It is obvious from the evidence that neither the grandparents nor the mother, at the time they permitted the latter to take Eva to West Virginia for the special purpose of there receiving medical treatment, thought or intended to thereby surrender their right to the custody of the child to the mother or that she was, by such arrangement, to repossess her except for the brief period required for Eva's undergoing the medical treatment recommended by her and that such was clearly the understanding of the parties is further evidenced by the fact that after the child had been treated by the West Virginia doctors for some four or five months, she was brought back by her mother and allowed to return to and resume her home with her grandparents.

However, notwithstanding that such appears to have been the agreement of the parties with reference to the mother's permitted taking of Eva to her West Virginia home, the mother, soon after Eva had returned, with her consent, to her grandparents' home, which it appears she continued to regard as hers, to be there cared for and reared by them, did then very belatedly become desirious

of taking back her child, after the long period of some ten years, during which she had never questioned the fitness of the grandparents to have her custody or sought to regain it but has willingly allowed her child to live away from her in another state, there to be cared for by the appellants, her grandparents, without ever seeing her or spending more than a few brief hours with her once a year when visiting other kinspeople who lived nearby. Accordingly, looking to recovering the child's custody, she filed motion in her original divorce action asking that the court give back to her the child's custody and control, which the court did restore to her in part as herein above set out.

Much proof was heard on the question of the suitability of the mother and grandparents to have the custody of the child and as to who was the more suitable and fitting custodian for her and who, as such, would best advance the welfare and interests of the child.

The evidence shows that Eva, now nearly twelve years old, is a very delicate child, afflicted, as stated supra, both with what is termed a "leaking heart" and an enlarged heart and that, where both conditions exist, such heart condition is one from which, the doctors who have examined or treated her testify, she may die at any moment and is incurable and that her chances of living are all against her, but that rest and quiet and freedom from all tiring exercise and excitement constitute the best prescription for prolonging her life.

Such being the proof, the only matters here calling for consideration are the alleged contract concerning the child's custody, the effect to be given it and the welfare of the child.

The record discloses that the appellants are worthy and estimable old people, who have, it appears, bestowed on their delicate and afflicted little granddaughter, throughout this long period of some ten years they have been intrusted with her custody and rearing, every care and affectionate consideration available or within their power to help her regain her health and promote her general welfare and happiness; that they live alone with this child in a quiet, isolated mountain home; and that they have and are able to provide Eva with a good home and the things necessary for her comfort and welfare.

Further we find nothing in the record indicating that either the grandparents or the mother are not alike industrious people of good character, qualifying them both as fit and suitable to be entrusted with the custody and rearing of the child were that question now presented free from the special circumstances set out above.

The mother, it must also be admitted, can offer the child better advantages as to schools, church attendance and amusements than can be given her by her grandparents under their living environments, as their home is located in an isolated and remote part of Knott county, where there is maintained but a seven months school, about a mile distant from their home and only accessible during the winter month by traveling afoot its almost impassable roads; and there is no doctor nearer to them than the town of Hindman, some fifteen miles distant, or no church nearer than four miles, at which service is held but once a month. Also this one nearby school, for the better part of its six or seven months term, is inaccessible except by walking and climbing over the hilly and rough road leading thereto, which Eva is prohibited from doing by reason of her heart affliction, which is in sharp contrast with the school conditions obtaining at the mother's home, where, she testifies, there is an excellent and accessible nine months graded school, to and from which free bus transportation would be daily furnished from the very gate of her home.

Under normal conditions these superior advantages and opportunities for educational advancement, church attendance and moral training offered by the mother would be very persuasive that a home with her and her present husband and their young children, even though they are almost strangers to her by reason of her long lack of association with her mother, would work most effectively to advance the best interests of the child. However, notwithstanding these attractive offerings of the mother, this weak and sickly child's very decided choice, wish and insistence, as testified by her, is to live in the quiet, restful home of her grandparents, to which she has for ten years now become accustomed and feels that it is her home, which she has grown to love. However, it must be conceded the child's health is here the controlling consideration, as it is of such a critical character, due to her heart affliction (as testified by all the doctors who have examined her) that she is liable to die at

any moment and against such eventuality they prescribe, as the very best treatment for her condition, the loving care, quiet and rest which she receives and enjoys in abundance in the home of her grandparents, which better affords her these, to her important, living conditions by reasons of its isolated location than she could or would receive in the mother's home and environment.

The child testifies that during her brief stay with her mother, she had to sleep in a bed with two of her young half brothers, ages seven and six; also, that she was there required by her mother to do menial chores about her home and was twice spanked by her. In the grandparents' home it appears she is not asked to do any work or chores about the house or make any tiring effort, but is left undisturbed to follow her bent in restful leisure or to study the school books they furnish her, according to her inclination.

The appellant, Bud Noble, too is shown to maintain a good home and to be a man of industrious habits and dependable character, who lives in a comfortable home, rent free, on a large tract of land owned by his employer company; and in addition personally owns two farms and is able to maintain and provide his granddaughter with a good and comfortable home and has sufficient means to satisfy all her reasonable desires and material needs.

In view of this showing by the record, it is obvious that we are here concerned, as stated above, with but two matters worthy of consideration, which are; first, the binding character of the alleged agreement made between the grandparents and the mother, giving them the care and rearing of the child; and, second, who, as between the child's mother and her paternal grandparents, is best suited and qualified to provide her with a home, surroundings and the considerate daily attention best calculated to promote her best interest and welfare.

As to the first, the contract by which the mother gave the custody of the child to its paternal grandparents was made by her prior to her divorce and when a femme covert and therefore, if such fact stood alone, it would be unenforceable. Stapleton v. Poynter, 111 Ky. 264, 62 S. W. 730, 731, 53 L. R. A. 784, 98 Am. St. Rep. 411. But it is shown by the record that Clora Noble's husband, Bent Noble, did also approve his wife's act in

awarding the custody of their child to its grandparents and he testifies he thinks they should have it and that he will contribute towards its support.

Further, it is to be noted that when the mother was thereafter divorced, she did not ask to recover the custody of her child, whom she had voluntarily given the appellants, but let its custody be awarded to its grandparents without objection made thereto and in which she continued to acquiesce for some ten years thereafter, suffering them to bring up the child, serving to constitute a ratification of the earlier agreement made with them. However, without deciding the question as to whether the contract with the grandparents thereafter became enforceable, we are of the opinion that the provision of the contract awarding the custody of the child to the grandparents is one which very clearly best serves the interest and welfare of the child, under the circumstances here presented, where the principal concern is that her custody be so awarded as to best provide her the necessary quiet and rest, which she now has and will have in the country home of her grandparents, to help insure the prolongation of her life. Educational and other advantages weigh but lightly in the scale against such dominant health consideration.

> As said in Stapleton v. Poynter, supra:
> "The welfare of a child, its life, health, and moral and intellectual being, should be, and are, kept well in view by the courts in determining its legal disposition in litigations over it."

A very like situation and question as here before us were presented and determined in the cases of Cummins v. Bird, 230 Ky. 296, 19 S. W. (2d) 959; Bridges v. Matthews, 276 Ky. 59, 122 S. W. (2d) 1021; and Staggs v. Sparks, 286 Ky. 398, 150 S. W. (2d) 690.

In the Bridges case, supra, as well as in the Cummins case, the question presented was whether the parent or grandparent was entitled to the custody of the child.

There the court said [276 Ky. 59, 122 S. W. (2d) 1023]:

> "The evidence in this case shows that the child, now about 12½ years of age, has a good home in a good community, and that those with whom he has lived nearly all of his life are devoted to him

and willingly performing for his welfare all that could be desired. * * * He has reached the age where it would be difficult for him to adjust himself to new surroundings completely at variance with those with which he has been familiar. He expressed a strong desire to remain with his grandmother, and, under the circumstances of this case, his desire should be given great weight. In Cummins v. Bird, 230 Ky. 296, 19 S. W. (2d) 959, this court adjudged that the maternal grandfather was entitled to the custody of a 12 year old child as against the father, and the desire of the child was the decisive factor in the case. What was said in the opinion in this case is peculiarly applicable here ([19 S. W. (2d) at] page 962):

" 'The duty of denying to a father the custody of his child is a serious and solemn one, but when the father for years has relegated to others his duties and responsibilities respecting the child, and when those others, actuated by love and affected by the ties of kindred, have accepted the responsibilities and performed the duties thus thrust upon them, their rights are not to be ignored, but should be preserved, unless the change proposed is consistent with the legal rights and would benefit the child, which is always the peculiar care of the court. This record not only fails to show that the child's welfare would be promoted by a change in her custody, but makes it clear beyond cavil that her supreme good will be subserved, and the legal rights of the litigants preserved, by permitting the existing situation of the child to remain undisturbed.'

"If sympathy for appellant in his natural desire to have the companionship and care of his son would control, the prayer of his petition would be granted, but a still more sacred consideration must direct our judgment. The controlling consideration is the welfare of the child. Here the child has been separated from his father since early infancy, and obviously has transferred his interests and affections to his present home and those who compose the family of which he is now a member. Undoubtedly, it would be a serious injury to him to sever the ties that now bind him to his surroundings and those whom he loves. After a careful consideration of

the record, we have concluded that the chancellor correctly adjudged the custody of the child to the appellee."

It is apparent that the question presented in the instant case comes within the rationale and rule of the decisions announced and applied in the Cummins and Bridges cases, supra, and is properly controlled by the same considerations found dominant and controlling in those cases as representing the best interests of the child.

Here undoubtedly the outstanding question to be considered is in whose custody and home, the grandparents' or the mother's, will the child find the surroundings and quiet, restful living conditions best calculated to promote her better health. We do not feel that the mother's offering better schools and amusements is of vital importance here, where the child's health and life itself is such that she mostly needs quiet and rest, which surely she will best find in the home of her grandparents.

In view of these considerations, we are constrained to conclude that the learned chancellor's award of the custody of the child to the mother for the nine months school period is not for the best interests of the child and therefore he is directed to set aside this modification of his earlier judgment.

However, we do not intend by such direction given that the mother should be denied the society of her child within reasonable limits and we are constrained to see to it that the mother be allowed to see her child and enjoy its society at reasonable times. This is a matter that may be governed by mutual agreement between the grandparents and the parent or by order of the court.

The learned chancellor's judgment is therefore reversed on the appeal and remanded with directions to enter a judgment in conformity with this opinion.