Jean S. CLAY, Appellant,

v.

Howard CLAY, Appellee.

Court of Appeals of Kentucky.

April 22, 1960.

J. B. Clarke, C. P. Stephens, Prestonsburg, for appellant.

W. W. Burchett, Prestonsburg, for appellee.

PALMORE, Judge.

The appellant, Jean Clay, brought this suit against her husband, Howard Clay, asking for an absolute divorce, custody of the three children of the parties, and alimony in the sum of $10,000. The husband counterclaimed for an absolute divorce and custody of the children. After hearing the proof the trial court (1) awarded the husband a divorce from bed and board and custody of the oldest child, Jack Edward, a 9-year old boy, (2) granted the wife custody of the younger two boys and an allowance for their support in the amount of $120 per month until the husband should be steadily employed (at which time the amount increases to $150 per month), and (3) denied the wife's claim for alimony. Each parent was given visitation privileges with respect to the child or children placed in the custody of the other, and the judgment further provided that during the summer months all three children together should spend 30 days with one parent and 30 days with the other. The wife was directed to vacate the home owned by the husband. Judgment was entered without specific findings of fact.

On this appeal the wife contends that she should have been given (1) custody of all three of the children, (2) alimony, and (3) an allowance of $200 per month for the support of the children. We are sustaining all three of these contentions.

The parties were married in September of 1947 and lived together for 10 years thereafter. Howard was 20 years old and Jean 15 at the time of their marriage. Jean had lived at the Magoffin Baptist Institute between the ages of 11 and 15.

Howard, a railroad fireman, owned a little 4-room house 150 feet from the home of his parents, J. B. and Gertrude Clay, in the town of Allen, Kentucky, but instead of occupying it as a home he took Jean to live with his parents, where they remained during the first two years of the marriage and had their first two children. Trouble developed early. Jean wished to live in Howard's 4-room house, apart from the parents, but evidently it was not as nice a place as the commodious home of the elder Clays, and Howard was reluctant. Finally Jean herself notified the tenant of the small home to vacate, and she and Howard and the baby moved there. Jack Edward, the oldest child, remained with the grandparents. Later Howard bought a larger house, side by side with the home of his parents, and they moved into it. Howard owned the two houses at the time of this litigation but was living in the home of his parents.

The marriage of these parties has been liberally punctuated by progressively mounting antagonism between Jean on the one side and her husband and his parents on the other. It would do no good to detail here the various physical clashes between the 200-pound husband and his smaller wife, nor would it be proper to assess the merits of the case on the basis of what was said and done in the heat of battle. All of it was the inevitable outcropping of an extremely unnatural circumstance in that when Jean had come home from the hospital with her first baby in June of 1948 the grandmother took the child over and has had him ever since. That this has been the basic trouble among the parties seems quite clear.

The husband testified that Jean suffered from "some kind of deep sleep" and had difficulty in awaking when the baby cried at night. That he might himself have attended to some of the nocturnal chores indigenous to babyhood apparently did not occur to him, and the grandmother, in the time-honored fashion of all grandmothers, lent a willing hand. No doubt the young

mother did not at first find the situation unwelcome. She was then but 16 years of age and probably ignorant of the duties of motherhood (which the mother-in-law might well have taught her instead of assuming them herself). Jean had her second boy before they moved out of the big house into Howard's 4-room place and had the third child a year or so thereafter. Jack Edward, the first-born, has stayed with the grandparents all of his life.

The evidence is conflicting as to whether it was agreeable with Jean for Jack Edward to remain in the home of the grandparents. She maintains vigorously that she always wanted the boy, but that Howard would not heed her entreaties to take him away from Howard's mother and father. Howard, on the contrary, says that the arrangement was perfectly agreeable all around, his wife being a poor hand at taking care of children. It is undisputed, however, that in 1950, not long after the move to the small house, Jean filed a suit for divorce against Howard which eventually ended in a reconciliation and an agreement that Jack Edward would be brought home to his mother. This agreement, however, was callously ignored by Howard, who admittedly made no attempt to carry it out. It is also undisputed that in 1950 Jean went to the county attorney for advice as to how to regain possession of her boy from his grandparents.

In about 1951 or 1952 the estrangement between Jean and the older Clays reached the breaking point through an incident in which Jean sought to chastise Jack Edward following a fracas between him and another child. Fleeing his mother's blows, Jack Edward sought and found sanctuary in the protective hands of the grandparents, who apparently let him run into the house and then made a stand on the porch to prevent Jean's continued pursuit into the house. This precipitated a battle in which the elder Mr. Clay says (perhaps exaggerating) that Jean whipped everybody within range. And although the two families lived within a few feet of each other, for the next 6 or 7 years after this incident Jean did not again enter the home of Howard's father and mother, where her son Jack Edward continued to reside.

Jack Edward seems to have fared very well at the home of his grandparents. The grandfather, J. B. Clay, testified that he provided everything for the boy ("and if I have got a dollar he has got it"), boasting that when Howard gave him his weekly allowance of a dollar, and admonished him that when it was gone he would get no more, Jack Edward "just gave him the horse laugh up his sleeve because he knows where he gets his money from." Obviously he has been made a privileged character. Whether the boy could now survive the realities of life in a home with two brothers and a high-spirited mother after these years of pampering by the doting grandparents is the most difficult question in this case. As is conceded on both sides, his welfare overrides all other considerations on the matter of custody, including the recognized policy of the law to leave children of tender age with the mother. Wright v. Thomas, 1948, 306 Ky. 763, 209 S.W.2d 315; Noble v. Noble, 1942, 292 Ky. 433, 166 S.W.2d 991; Fertig v. Fertig, 1927, 218 Ky. 370, 291 S.W. 706; Travis v. Travis, 1940, 282 Ky. 215, 138 S.W.2d 336.

That the mother is a fit and proper person to have custody of her children is implicit in the chancellor's award of the two younger boys to her, and if she is fit to raise them she is fit to raise Jack Edward also. It is the opinion of this court that Jack Edward should be raised with his brothers. His princely existence in the home of the grandparents (where the father intends for him to remain) may be more enjoyable to him for the time being, but does not bode well for his future. If he cannot learn to live with his brothers, it is doubtful that he could be expected to adjust himself to the rest of the world when the indulgent grandparents are gone. Living with his mother and brothers will not prevent him from spending time with

his father and grandparents, and his own wishes may be given some degree of consideration as he approaches maturity. In preparing an appropriate modification to the judgment the chancellor will, of course, provide for reasonable visitation privileges and will retain jurisdiction to direct such further modifications as may be indicated by future developments.

■ Howard Clay testified that he earned from $400 to $500 per month but was temporarily laid off at the time of the trial. He lives with his father and mother and owns two other houses which can be rented out. Jean Clay was required (wisely so) by the judgment to find a new home, Howard's two houses being within "spitting distance" of the home of his parents. Since she is to have custody of all three children it is our opinion that she is entitled to no less than $200 per month for their support, subject to modification if necessary by reason of a reduction in Howard's income.

■ We come now to the question of alimony, which requires a consideration of the merits of the case on the matter of fault. Where the wife is entirely at fault she cannot recover alimony. Rutledge v. Rutledge, Ky.1958, 310 S.W.2d 276. But even where the divorce is awarded to the husband the wife may be awarded alimony if there is some fault on both sides and she has not been guilty of moral delinquency. Coleman v. Coleman, Ky.1954, 269 S.W. 2d 730. In such a case the matter is largely within the discretion of the court. Taylor v. Taylor, Ky.1960, 331 S.W.2d 895.

The evidence, as may be inferred from what has been said thus far in this opinion, shows conduct on the part of each spouse toward the other that is regrettable. But the underlying cause is crystal clear, and in it the fault was the husband's. He knew he had married a child. If she had shortcomings as a mother it was his duty as her husband to help her master the responsibilities of motherhood which, after all, he had thrust upon her himself.

Assuming, for the sake of discussion, that at some time she "consented" to have her first-born boy brought up by the grandparents, such a consent was obviously contrary to nature, and it was inhuman of the husband to enforce it in the face of his wife's efforts to bring the child back to her. Certainly it was wrong to permit the grandparents to appropriate him as their own and rear him to the exclusion of his mother under her very nose. Small wonder it is that Jean became dissatisfied and embittered. She did well to bear with the situation for eight years.

■ It has been recognized by this court that a husband is obliged to provide his wife a home where the interfering influence of his parents will be at a minimum. Salyer v. Salyer, 1947, 303 Ky. 653, 198 S.W. 980. In the present case he has not only failed to carry out that obligation but has aggravated the situation by actively condoning the permanent separation of his wife from her child. On the face of it, this constituted cruel and inhuman treatment which should have entitled the wife to an absolute divorce.

■■ In his counterclaim seeking a divorce Howard accused Jean of lewd and lascivious conduct. It seems that while they were living in the little 4-room house, and just after she had undergone some sort of operation, Jean used a neighbor's telephone several times at night while Howard was away at work and called a physician to her home. The neighbor's suspicions were aroused, and she promptly reported them to Howard's mother, who dutifully and at once conveyed the tidings to Howard. Howard says he believes his wife was unfaithful to him on this occasion, but he nevertheless continued to live with her for several years thereafter. An unfounded and unsustained charge of lewd and lascivious conduct against the wife amounts to cruel and inhuman treatment sufficient to support a judgment of divorce, and in such event the wife is entitled to alimony. Wright v. Thomas, 1948, 306 Ky. 763, 209

S.W.2d 315; Rose v. Rose, 1946, 302 Ky. 658, 195 S.W.2d 269. Such a charge is considered unfounded if it is not supported by sufficient evidence to imply good faith. Wiggins v. Wiggins, 1937, 268 Ky. 352, 104 S.W.2d 1097. We shall not recount the evidence of the alleged misconduct, as it proved nothing. It was insufficient to indicate good faith.

Both parties sued for an absolute divorce, but neither complains of the fact that only a limited divorce was granted. Therefore, though it is the opinion of this court that the wife was entitled to an absolute divorce, we are not called upon to direct it on this appeal. As to the matter of alimony it is necessary only that we confirm the wife's right to an allowance, leaving the amount and method of payment to the sound discretion of the trial court.

The cause is reversed and remanded for entry of a judgment consistent with this opinion and for such further proceedings as may be appropriate.

STEWART, J., dissenting.